IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

EDWARD A. LESLEY                    )
                                    )
v.                                  )    No. 3:05-0057
                                    )    Judge Nixon/Brown
JO ANNE B. BARNHART, Commissioner   )
of Social Security                  )


To:  The Honorable John T. Nixon, Senior Judge


## REPORT AND RECOMMENDATION

         This is a civil action filed pursuant to 42 U.S.C.

§405(g), to obtain judicial review of the final decision of the

Commissioner of Social Security denying plaintiff disability

insurance benefits ("DIB"), as provided under Title II of the

Social Security Act ("the Act"), as amended.  The case is

currently pending on plaintiff's motion for judgment on the

administrative record (Docket Entry No. 10), to which defendant

has responded (Docket Entry No. 13).  For the reasons stated

below, the Magistrate Judge recommends that plaintiff's motion be

**DENIED**, and that the decision of the Commissioner be **AFFIRMED**.


### I.  INTRODUCTION

         Plaintiff filed his DIB application on August 16, 2000

(Tr. 191-93).  Following denials at the initial (Tr. 177-180) and

reconsideration (Tr. 182-83) levels of adjudication, he filed a

1

timely request for hearing before an administrative law judge

("ALJ") (Tr. 184). A hearing was held on May 31, 2002 (Tr. 460-

494). On July 19, 2002, the ALJ issued a written decision

finding plaintiff not disabled (Tr. 49-59). On August 1, 2002,

plaintiff requested Appeals Council review, and on June 17, 2003,

the Appeals Council vacated the ALJ's decision and remanded the

case with instructions (Tr. 71-74). The Appeals Council noted

that plaintiff had filed a new DIB application on October 17,

2002, and ordered that application associated with the case on

remand to the ALJ (Tr. 73). The same ALJ held a second hearing

on February 18, 2004 (Tr. 495-517), and again issued a written

decision finding plaintiff not disabled on June 17, 2004 (Tr. 15-

36). The ALJ made the following findings:

1. The claimant met the insured status requirements of the
   Act as of the alleged disability onset date, April 1,
   1999.

2. The claimant has not engaged in substantial gainful
   activity since April 1, 1999.

3. The claimant has a combination of impairments
   considered "severe," which includes hepatitis C,
   cirrhosis and alcohol abuse.

4. This combination of impairments does not meet or
   medically equal one of the listed impairments in
   Appendix 1, Subpart P, Regulation No. 4.

5. The claimant's allegations regarding his limitations
   are not totally credible for the reasons set forth in
   the body of the decision.

6. The claimant has the residual functional capacity to
   perform medium work, which avoids concentrated exposure
   to fumes, odors, dust and gases.

2

7.  The claimant can perform his past relevant work as a
    lab technician/inspector of circuit boards, as a
    slitter operator, probably as propane tank filler and
    some of the past warehouse jobs.

8.  The claimant is 56 years old and has a college degree.

9.  The claimant has transferable skills.

10. Considering VE testimony and the claimant's age,
    education, work experience and residual functional
    capacity, Medical-Vocational Rule 203.16 may be used as
    a framework for decision making to show that there are
    a significant number of other jobs in the national
    economy that he could perform.

11. The claimant is not disabled, even considering drug and
    alcohol addiction; therefore, he has been "not
    disabled," as defined in the Act, at any time through
    the date of this decision.

(Tr. 35-36).

        On December 21, 2004, the Appeals Council denied

plaintiff's request for review of the decision of the ALJ (Tr. 7-

10), thereby rendering that decision the final decision of the

Commissioner.  This civil action was thereafter timely filed, and

the Court has jurisdiction.  42 U.S.C. § 405(g).  If the

Commissioner's findings are supported by substantial evidence,

based on the record as a whole, then these findings are

conclusive.  Id.

## II.  REVIEW OF THE RECORD

### A.  Medical Evidence

#### Physical

        Notes from Dr. Russell Smith dated April 12, 1999,

indicate that a colonoscopy showed 5 polyps, all small and

3

adenomatous (Tr. 268). He did not have any GERD symptoms, despite being off his medication. Id. Testing showed that the polyps were benign (Tr. 288). Plaintiff was treated on March 9, 2000, by Dr. Dozier, his primary care physician, for a diagnosis of hepatitis B (Tr. 357). Plaintiff complained of fatigue, insomnia, back pain, and decreased memory (Tr. 357). He had a history of drinking heavily for years and had recently resumed drinking. Id. He complained of some dizziness and light-headedness and had fallen several times with some head trauma. Id. Plaintiff had decreased breath sounds due to smoking. Id. Dr. Dozier found that plaintiff had hepatitis B chronic, low back pain musculoskeletal, insomnia, and that his decreased memory, hypertension, dizziness, and history of head trauma were all probably due to alcohol. Id. A chest x-ray showed no acute cardiopulmonary disease (Tr. 370).

Notes from Dr. Smith's office on March 16, 2000, indicate that he was being followed for chronic hepatitis C which plaintiff reported had been present for about 7 or 8 years (Tr. 266). Plaintiff stated that he had insomnia and that he used alcohol to help him sleep. Id. He was recently diagnosed with hypertension and was taking medication for this condition. Id. The note also stated that plaintiff was working at a temporary agency. Id. Plaintiff reported that he had never had significant depression. Id. Examination showed no spider angiomas but he

4

still had palmar erythema, his lungs and heart were unremarkable, his abdominal exam revealed no palpable liver or abdominal masses. Id. He was diagnosed with multiple colon adenomas, GERD with Barrett metaplasia, chronic hepatitis C since 1993, alcohol dependency, hypertension, chronic lower left quadrant pain, insomnia, heliobacter infection (treated in 1997), history of duodenitis (1997 in remission), possible anomalous origin right subclavian artery on CT scan, history of mild emphysema, hyperlipidemia, and old hepatitis B infection (resolved). Id.

Notes from March 23, 2000, from Dr. Dozier, state the plaintiff had hepatitis B and alcoholism (Tr. 356). Plaintiff had stopped drinking and his insomnia had improved with Ambien. Id. He also reported dementia and pressure in his head. Id. Dr. Dozier noted that plaintiff had abused drugs in the past. Id. Dr. Dozier found that plaintiff was not depressed and was trying to make some significant changes in his life. Id. An MRI of plaintiff's brain taken on March 29, 2000 was normal (Tr. 369).

Notes from Dr. Smith dated May 10, 2000, indicate that plaintiff was getting approval for his Rebetron and Interferon therapy (Tr. 265). He was still able to do temporary work at warehouses, but he reported having a dizzy spell. Id. Testing indicated that he had cirrhosis and advanced signs of hepatitis. Id. Notes from June 28, 2000 indicate that he'd started his Interferon and Rebetron therapy and was tolerating it fairly

5

well, with some fatigue (Tr. 264). Tylenol helped with some fever and chills the night of the injection. Id. He indicated that he was applying for disability. Id. He was not feeling particularly depressed and the doctor noted that plaintiff joked at the exam and did not have a particularly depressed affect. Id. The plan was to do some testing after 3 months of treatment, if the results showed improvement, he would continue treatment for 3 more months. Id. After 6 months of treatment he would be retested and if there were no signs of disease, he would be treated for 6 more months (Tr. 263-264). The doctor indicated that normally 12 months of treatment were necessary (Tr. 263). Three month testing results showed no significant toxicities, so treatment was continued. Id. Notes from August 2, 2000, stated that he was doing well clinically, with no new problems. Id.

Plaintiff was given a pulmonary function test on September 5, 2000, which showed a normal appearing flow volume loop, the spirometry showed a normal FVC and FEV1, and significant improvement was noted in his FEV1 post bronchodilator therapy (Tr. 366). Plaintiff was referred to Dr. Stephen Ticaric for cardiac evaluation on September 12, 2000, following complaints of chest pain (Tr. 296). Cardiac catheterization results showed a normal left ventricular function with ejection fraction of about 60% (Tr. 297). The coronary arteriogram showed only a mild 20-30% stenosis in the proximal right coronary artery

6

and normal left main, left anterior descending and left circumflex arteries (Tr. 297, 299). An EKG was normal (Tr. 297). Dr. Ticaric found that plaintiff's chest discomfort was of a non-cardiac origin. Id. Plaintiff was to continue with his medications and follow up with his primary physicians. Id.

Notes from Dr. Dozier dated September 20, 2000, state that plaintiff continued to complain of chest and abdominal discomfort and fatigue (Tr. 351). Plaintiff continued to drink sometimes a six pack every two days (Tr. 351). Dr. Dozier found that plaintiff's COPD was fairly stable and that his pulmonary functions showed improvement with bronchodilators. Id.

On September 27, 2000, plaintiff was evaluated by Dr. Bruce Davis (Tr. 309-311). Examination of his heart and lungs showed no abnormalities (Tr. 310). Spirometry results were normal (Tr. 311, 313). Musculoskeletal examination showed full motion and good strength in the neck, upper extremities (including normal wrist/finger motion and grip), the back, and lower extremities (including normal knee flexion and squatting) (Tr. 310). Plaintiff had a normal gait and normal gait maneuvers. Id. On neurological examination, plaintiff was alert, oriented, followed directions, had no focal cranial nerve, sensory, motor or reflex abnormalities. Id. Dr. Davis diagnosed plaintiff with cigarette associated breathing complaints, gastrointestinal disease; esophagus, stomach, intestine, liver

7

disease treatment; labile high blood pressure; and anxiety/depression treatment (Tr. 311). Based on his exam and his review of laboratory testing results, Dr. Davis found that plaintiff would be able to lift and carry 20 pounds occasionally and 10 pounds frequently, stand or walk six hours out of an eight hour day, sit for 8 hours, and should have limited exposure to: heat/humidity, irritating inhalants, and liver damaging chemicals. Id.

Dr. Burr, a state agency medical consultant, reviewed plaintiff's records on October 3, 2000, and determined that the evidence showed he could lift and carry 20 pounds occasionally and 10 pounds frequently, sit, stand or walk for about 6 hours in an 8 hour workday (with normal breaks), and was unlimited in his ability to push or pull (Tr. 324-325). Dr. Burr also found that plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation (Tr. 327).

Notes from Dr. Dozier dated October 18, 2000, state that plaintiff complained of fatigue, left upper quadrant discomfort, insomnia, and occasional muscle cramps (Tr. 350). Plaintiff's hepatitis B was quiescent. Id. Notes from Dr. Dozier dated November 7, 2000, state that an ultrasound of plaintiff's abdomen did not show any hepatomegaly, gallbladder disease, or pancreatic disease (Tr. 349, 367). Dr. Dozier noted that plaintiff's restless leg syndrome was well controlled by Celexa

8

but his insurance company did not cover it (Tr. 349).  Dr. Dozier
gave him samples and was going to write a letter to the insurance
company. Id. Notes from Dr. Smith in December 2000, state that he
was going to stop plaintiff's anti-viral therapy in May and that
he was currently in a biochemical remission (Tr. 412).

In January 2001, Dr. Evelyn Davis, a state agency
medical consultant, reviewed plaintiff's records and determined
that he could lift and carry 20 pounds occasionally and 10 pounds
frequently, sit, stand or walk for about 6 hours in an 8 hour day
and was unlimited in his ability to push or pull (Tr. 387).
Plaintiff was also restricted from concentrated exposure to fumes
and odors (Tr. 390).  Plaintiff saw Dr. Dozier on April 18, 2001,
for follow up of hemoptysis which was thought to be secondary to
chronic bronchitis (Tr. 398).  Plaintiff's depression was "doing
well" on Celexa, his insomnia was treated with Ambien, his
irritable bowel had greatly improved on Librax, and his
hypertension was under fair control. Id. On November 20, 2002, a
state agency medical consultant reviewed plaintiff's medical
records and determined that he retained the capacity to lift and
carry 50 pounds occasionally and 25 pounds frequently; sit, stand
or walk for about 6 hours in an 8 hour workday with normal
breaks, and had an unlimited ability to push and pull (Tr. 99-
100).

Plaintiff was treated by Dr. Dozier on February 19,

2003 (Tr. 164). He complained of fatigue and had gained weight. Id. In March 2003, Dr. Smith performed a colonoscopy which revealed one benign polyp (Tr. 167). Plaintiff's hepatitis C was in sustained virologic remission (SVR). Id. Plaintiff was treated in the emergency room by Dr. William Little on May 2, 2003, for complaints of left mid back pain and a cough (Tr. 170). Plaintiff reported having a cough for one week, left flank back pain for three days, and that the pain was worse with deep breathing. Id. Plaintiff noted that he had been moving patio furniture that day and also noted that he smoked a pack of cigarettes a day. Id. A chest x-ray showed a normal cardiac silhouette, no acute infiltrates or effusions, no rib fractures, no pneumothorax. Id. A urinalysis was negative for blood or signs of infection. Id. Plaintiff was diagnosed with musculoskeletal pain and given Lortab and Vistaril for pain and cough suppression. Id.

Plaintiff underwent a physical evaluation on October 31, 2003, by Dr. Albert Gomez (Tr. 154-162). Plaintiff reported that he had hepatitis C since 1990, and that he had also been diagnosed with cirrhosis of the liver (Tr. 154). He complained of weakness and fatigue from his hepatitis and also back pain unrelated to any trauma. Id. He complained of shortness of breath, wheezing and cough due to cigarette smoking. Id. Plaintiff currently smoked a pack a day (Tr. 155). Plaintiff

10

also had a history of alcohol abuse and reported that he drank a six pack of beer a day, five days a week between 1980 and 2001. Id. He also used heroin daily from age 14 to 21. Id. On examination he was alert, oriented, and in no acute distress. Id. He had a normal gait and got on and off the exam table without difficulty. Id. Plaintiff had full range of motion in both shoulders, elbows, hips, knees, wrists, and ankles, his grip was good bilaterally, and his fine finger movements were normal (Tr. 156). His motor strength was 5/5 in the upper and lower extremities. Id. Straight leg raising was negative in the lying and sitting positions. Id. Examination of his back was within normal limits with a full range of motion in the lumbosacral spine. Id. Plaintiff was neurologically intact, and could tandem walk, walk on heels and toes, and could squat and stand on one leg normally. Id. Dr. Gomez diagnosed plaintiff with alcohol abuse, hepatitis C secondary to alcohol abuse, chronic low back pain, cigarette abuse, hypertension, and IV drug abuse but found that based on his examination, plaintiff had no impairment-related physical limitations (Tr. 158, 159-162).

### Mental

Plaintiff reported to Dr. Smith in May 2000 that he had never experienced major depression, that he had never required a psychiatrist, or been hospitalized for a mental condition, or had a suicide attempt, but he stated that he had experienced mild

11

depression in the past. Id. On September 29, 2000, plaintiff underwent a clinical interview, a mental status examination, and an IQ assessment administered by Jeri Lee, licensed psychologist (Tr. 318). Plaintiff reported that he could not work due to fatigue from hepatitis C and chest and other pains in his body. Id. Ms. Lee observed that plaintiff drove himself to the appointment, his gait was normal and he used humor well. Id. Evaluation of cognitive processes indicated that plaintiff's attention and concentration skills were intact, and assessment of memory functions revealed no significant deficits in his immediate memory (Tr. 319). He had an average vocabulary and intact abstracting ability. Id. Ms. Lee estimated that plaintiff's intellectual functioning was in the average range and she noted that testing results were consistent with this finding. Id.

Plaintiff reported that his daily activities included sweeping the porch, washing the dishes, walking the dog, and taking out the trash (Tr. 320). He was able to cook, and enjoyed reading, watching the news and sports on TV, visiting with his daughter and grandchildren, and talking to relatives on the phone. Id. He and his wife go out to eat occasionally and sometimes like to go to the movies. Id. Plaintiff said that he gets along with people very well. Id. He noted that he used to socialize a lot with his daughter and her husband but they had

12

recently moved to Florida, and that it was a strain to rely only on his wife's income. Id. He noted that if it weren't for these two factors he would go out even more. Id. He had no problem managing the checkbook, driving, dressing, bathing, doing homework, or taking care of children (Tr. 321). Ms. Lee found that plaintiff had a mood disorder due to his current general medical condition, and alcohol dependence (in remission since 1998) (Tr. 322). He was given a global assessment of functioning (GAF) of 60 (current) and 65 (past).[1]Id. Ms. Lee found that plaintiff's ability to understand and remember was not significantly limited, and he was moderately limited in his ability to sustain concentration and persistence, to socially interact and to adapt due to depressive symptomatology and fatigue. Id.

On November 5, 2000, plaintiff's records were reviewed by George Livingston, Ph.D., a state agency mental health consultant (Tr. 331-348). Dr. Livingston found that plaintiff did not meet or equal the requirements of listing 12.04 (Affective Disorders) (Tr. 345-346). In terms of functional capacity, Dr. Livingston found that the evidence indicated that plaintiff was "not significantly limited" in 14 out of 20 mental

---

[1]A GAF rating of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. Diagnostic and Statistical Manual of Mental Disorders (DSM), 32 (4th Ed. 1994). A GAF rating of 61-70 indicates some mild symptoms or some difficulty in social, occupational, or social functioning, but generally functioning pretty well and has some meaningful relationships. Id.

13

activities including the ability to understand, remember, and carry out short and simple instructions (Tr. 331-332). Plaintiff was "moderately limited" in his abilities to understand and remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday/week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; and to respond appropriately to changes in the work setting. Id. Plaintiff was not "markedly limited" in any category. Id.

Record documents indicate that plaintiff received treatment at the Evelyn Frye Center from April 2001 to October 2002 (Tr. 83-97, 423-456). At a visit on May 3, 2001, plaintiff reported that he had done warehouse work most of his working life and now he was too weak to work (Tr. 94). He was well oriented, had a good affect, no suicidal ideation, and no psychosis. Id. Plaintiff was diagnosed with major depressive disorder, not otherwise specified, with dysthymic disorder as a rule out diagnosis. Id.

By June 2001, he reported feeling a little better in mood and he was sleeping well (Tr. 89). Plaintiff noted that he was feeling more alert and had more clarity in his thoughts than he had in years, and his sense of humor was coming back (Tr.

14

440). He was putting together a book of poetry and realized that goal directed behaviors and Celexa helped his mood. Id. He enjoyed staying busy and interacting with others. Id. Plaintiff's GAF was 60 (moderate symptoms). Id.

Notes from July 2001 again report that plaintiff had an improved mood although he was still physically weak and easily fatigued (Tr. 88). At his next visit in September 2001, plaintiff reported that he stopped his medication because it left an odd taste in his mouth (Tr. 87). He was upset because his son was sent to jail for aggravated assault. Id. The doctor rated plaintiff's GAF at a 65 (mild symptoms) in September and October 2001 (Tr. 87, 431, 433). Notes from December 2001, indicate that plaintiff had put in a number of job applications but had gotten no response (Tr. 430). Plaintiff thought that he could not physically perform the blue collar jobs he did in the past and agreed to contact disability services and job corp for help getting a job. Id. Plaintiff's GAF was again rated 65 (mild symptoms). Id.

At his April 30, 2002, visit plaintiff noted that he applied for disability (Tr. 85). He complained of fatigue, insomnia at night, but noted that he slept during the day. Id. He had a low mood but denied suicidal ideation. Id. He had fair concentration and no psychotic symptoms. Id. Plaintiff's GAF was rated 55 (moderate symptoms). Id. Plaintiff's therapist, Laura

15

Rencher, Ph.D., completed a form for him in support of his disability claim (Tr. 424-426). Dr. Rencher found that plaintiff had only a fair ability to adjust to a job in 5 out of 8 categories in this area, and had poor or no ability to deal with the public, deal with work stresses, and maintain attention and concentration (Tr. 424). Dr. Rencher noted that plaintiff's depressed mood, irritability, and narcissistic personality traits interfered with these functions. Id. Dr. Rencher found that plaintiff had a good ability to understand, remember and carry out simple job instructions, a fair ability to carry out detailed but not complex job instructions, and poor or no ability to behave in an emotionally stable manner. Id.

By his visit in May 2002, plaintiff's emotions were better controlled (Tr. 84). The next treatment record is from five months later in October 2002 (Tr. 83). Plaintiff was sleeping better but his mood was still low and he was fatigued due to his hepatitis C. Id. He was hoping to return to work if his energy improved. Id. Plaintiff's GAF was 65 (mild symptoms) and he did not need to be seen for another six months. Id.

On December 17, 2002, plaintiff underwent a mental evaluation by Jeri Lee, Ed.D., licensed psychologist (Tr. 106-109). Plaintiff reported that he was prevented from working due to fatigue, weakness, and shortness of breath from hepatitis C (Tr. 206). Plaintiff drove himself to the appointment. Id. He

16

presented socially withdrawn and irritable. Id. On exam, his attention and concentration skills were intact, he was fully oriented, and his intellectual functioning was in the average range (Tr. 107). Plaintiff currently smoked about a half pack a day and had a past history of drug and alcohol abuse (Tr. 108).

Plaintiff reported that daily activities included taking out the trash, doing the dishes, doing the laundry, watching television, and reading (Tr. 108). He had no problems driving, cooking, dressing, bathing, shopping for groceries, doing homework, taking care of children, or getting along with others. Id. He did report some difficulty remembering appointments and sticking with tasks until they are completed. Id. Ms. Lee found that plaintiff's abilities to understand and remember, to sustain concentration and persistence, to socially interact and to adapt were not impaired at this time (Tr. 109). Plaintiff's GAF was 70 (mild symptoms) currently and in the past. Id. In January 2003, a state agency psychological consultant reviewed plaintiff's records and determined that plaintiff had no medically determinable mental impairment (Tr. 110).

Notes from Dr. Dozier, plaintiff's primary care physician, dated February 19, 2003, state that his depression was stable on Celexa and his insomnia was relieved with Ambien (Tr. 164). On September 23, 2003, plaintiff underwent another mental status examination by Linda Blazina, Ph.D. (Tr. 127-132).

17

Plaintiff reported that he was unable to work due to fatigue (Tr. 127). On examination, plaintiff was alert and cooperative, his mood was euthymic and his affect was congruent, his speech was normal, he had no impairment in his reality testing, and his thought processes were logical and coherent. Id. He had no suicidal or homicidal ideation or intent (Tr. 128). He was fully oriented, his remote and recent memory were adequate, his new learning abilities were below average, but his vocabulary was good, his abstracting abilities were intact. Id. Dr. Blazina found that plaintiff's intellectual functioning was within the high average range. Id. Plaintiff reported no difficulties completing his activities of daily living, driving a car, managing money, or shopping as necessary (Tr. 130). He was able to do household chores such as washing the dishes, taking out the garbage, and washing the car. Id. He saw friends and family on a regular basis. Id. Plaintiff was diagnosed with anxiety disorder and given a current GAF of 75[2] (Tr. 131). Dr. Blazina found that plaintiff's ability to understand and remember was mildly limited, and he might have difficulty remembering complex or detailed instructions. Id. His ability to sustain concentration and persistence was mildly limited and Dr. Blazina opined that he would likely have difficulty sustaining work activity over a

_____

[2]A GAF score of 71-80 indicates that if symptoms are present, they are transient and expectable reactions to psychosocial stressors and there is no more than slight impairment in social, occupational, or school functioning. DSM IV at 32.

18

normal work week due to his psychological symptoms and fatigue. Id. Plaintiff's social and adaptation abilities were not limited. Id.

Plaintiff was also evaluated on October 16, 2003 by Alan Yarbrough, Ed.D., psychologist (Tr. 147-153). Plaintiff reported that his medications had improved the severity of his depressed mood and he denied experiencing sadness at the time (Tr. 148). Plaintiff's long and short term memory were intact, he had normal affect and mood, he was cooperative, and his language was logical and goal directed and his speech was normal (Tr. 149). Plaintiff's estimated level of intellectual functioning fell within the average range. Id.

Plaintiff reported that he liked to watch baseball and read novels, and that he had no trouble with comprehension when reading (Tr. 148). Plaintiff did minor repairs and chores around the house such as unclogging a drain, sweeping the porch, washing dishes, taking out the trash, washing the car and refinishing a sewing table (Tr. 148-149). Dr. Yarbrough concluded that plaintiff did not appear to be experiencing impairment in his ability to understand, remember, or concentrate, his social interaction was appropriate, and no impairment was noted in his ability to adapt (Tr. 149). Plaintiff was diagnosed with major depression recurrent, in partial remission and he had a GAF of 60. Id. In October 2003, a state agency mental health expert

reviewed plaintiff's files and determined that plaintiff did not have a severe mental impairment and did not meet any mental listing (Tr. 133-146).

B. <u>Testimonial Evidence</u>

Plaintiff alleged disability commencing April 1, 1999 (Tr. 191), due to emphysema, hepatitis C, and colon problems (Tr. 207). He was born on February 14, 1948, and is a college graduate (Tr. 463).

Plaintiff testified that he experienced the following symptoms of hepatitis: redness in his hands, intermittent pain in his right side and constant pain in his left side, and "a lot of fatigue." (Tr. 469). He testified that he had to take frequent breaks when performing activities, such as light housework, even when performing them at a slow pace (<u>id.</u>). He testified that he took one to two naps per day, for up to an hour or two each time (Tr. 469-470). Before he started taking the antidepressant Celexa, he used to have difficulty controlling his emotions (Tr. 470). He testified that he underwent Interferon therapy for approximately one year, during which he experienced significant side effects which he equated to daily flu-like symptoms (Tr. 472). Specifically, he reported experiencing chills, aches, fever, and a total lack of strength during that period (<u>id.</u>). He testified that due to his liver problems, he cannot take anything stronger than children's aspirin for pain relief (Tr. 473).

20

Plaintiff testified that after he completed his Interferon therapy, his stamina and strength never returned (Tr. 476). He testified that as little as thirty minutes of activity caused him to experience fatigue to the point where he had to stop the activity (Tr. 477). Plaintiff testified that fatigue was the primary reason that he could not work (Tr. 510). He testified that he also experienced bilateral hand tremors and significant memory problems (Tr. 479-480, 508).

Plaintiff further testified about his current and past alcohol use (Tr. 473-75, 506-07), admitting to past alcohol abuse including consumption of one or two six-packs of beer per night, but stating that he rarely consumed alcohol now (Tr. 473-74). He testified that he did not think that his drinking ever reached the point of alcoholism and that it had never caused him any problems (Tr. 507).

Plaintiff testified that around December 2001, he felt like he might be able to do some part-time work and contacted the state agency responsible for vocational rehabilitation services, but was informed that that agency could not help him until there was a determination on his disability claim (Tr. 476).

Plaintiff's wife, Kathleen Lesley, a full-time IRS employee (Tr. 487), testified at plaintiff's first hearing (Tr. 482-89). She testified that her husband rarely consumed alcohol now but admitted he used to have a serious drinking problem (Tr.

21

483). She did not regard his present drinking as problematic (Tr. 484). Mrs. Lesley testified that during the period of her husband's Interferon therapy, she observed him experience fever, chills, shaking, and "a lot of moaning." (Tr. 484). She reported that she first noticed her husband's memory difficulties around 1998 and that it had gotten progressively worse, to the point that she had to write things down for him (Tr. 485). She testified that she was afraid to let her husband cook because she was afraid he would leave the stove on and maybe burn down the house (Tr. 487). She testified that he could not remember to finish what he started (id.).

Mrs. Lesley testified that her husband tired easily and that she could tell he was tired by his physical appearance, including gray coloring, beads of sweat, and shaking hands (Tr. 486). She testified that her husband could persist in activities for only twenty minutes before having to stop and rest, and also confirmed that he took naps during the day (Tr. 486-87).

### III.  CONCLUSIONS OF LAW

#### A.  Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. Jones v. Secretary, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial

evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision.  <u>Landsaw v. Secretary</u>, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion."  <u>Her v. Commissioner</u>, 203 F.3d 388, 389 (6th Cir. 1999)(<u>citing</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance."  <u>Bell v. Commissioner</u>, 105 F.3d 244, 245 (6th Cir. 1996).  Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. <u>Her</u>, 203 F.3d at 389 (<u>citing</u> <u>Key v. Callahan</u>, 109 F.3d 270, 273 (6th Cir. 1997)).  However, if the record was not considered as a whole, the Commissioner's conclusion is undermined.  <u>Hurst v. Secretary</u>, 753 F.2d 517, 519 (6th Cir. 1985).

B.  <u>Proceedings at the Administrative Level</u>

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

23

months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process, as follows:

(1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
(2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
(3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[3] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.
(4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a <u>prima facie</u> case of disability.
(5) Once the claimant establishes a <u>prima facie</u> case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

<u>Moon v. Sullivan</u>, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics

---

[3] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

identically match the characteristics of the applicable grid rule. Otherwise, the grid can not be used to direct a conclusion, but only as a guide to the disability determination. Id. In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's prima facie case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. See Varley v. Secretary, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. § 423(d)(2)(B).

### C. Plaintiff's Statement of Errors

Plaintiff contends that the ALJ erred in the following respects: (1) in finding that his mental impairment was nonsevere during the period at issue, when some evidence indicates the presence of a severe mental impairment during a portion of that period; (2) in rejecting the opinions of plaintiff's treating sources; (3) in failing to perform the function-by-function assessment of plaintiff's exertional abilities regarding sitting,

25

standing, walking, lifting, carrying, pushing, and pulling, as
required by Social Security Ruling 96-8p; and (4) in relying on
the VE's testimony of the availability of plaintiff's past
relevant work, when the hypothetical question which elicited this
testimony characterized plaintiff as having the RFC to perform
"moderate" work, rather than "medium" or any other level of work
employed and specifically defined in the regulations.  As stated
below, the undersigned concludes that the ALJ did not err in any
of the foregoing respects.

While conceding that his mental condition has improved
"over the past few years," plaintiff argues that the severity of
his mental impairment during a portion of the period at issue
here is demonstrated by the assessment of his treating
psychologist, Dr. Rencher, who was plaintiff's primary therapist
during his treatment at The Evelyn Frye Center between April 2001
and October 2002.  He further argues that this severity was
recognized by the government's consulting psychologist and the
state agency psychological consultant.  However, these arguments
ignore the fact that the ALJ did not dismiss any possibility of
functional limitation from the alleged mental impairment at step
two, but merely found the extent of limitation no more than
minimal.  The ALJ proceeded to consider the evidence of
plaintiff's mental limitations in conjunction with his
determination of plaintiff's RFC (Tr. 33-34).  Thus, the mere

26

failure to find a severe mental impairment at step two of the sequential evaluation process could not constitute reversible error.  <u>Maziarz v. Sec'y of Health & Human Svcs.</u>, 837 F.2d 240, 244 (6th Cir. 1987).  Rather, the extent to which the ALJ may have erred in discounting the evidence of more than mild mental limitations is an issue properly addressed by plaintiff's next argument -- that the opinions of his treating physicians should have been credited.

However, the undersigned finds no error in the ALJ's rejection of Dr. Rencher's assessment of plaintiff's mental abilities.  The ALJ explained that Dr. Rencher's dire assessment was contradicted by her own treatment notes, wherein GAF scores indicative of only mild symptoms were frequently given, as well as by the opinions of most other consulting mental health practitioners.  While consulting examiner Jeri L. Lee, Ed.D., opined in September 2000 that plaintiff had some moderate mental limitations (Tr. 322), as did the state agency consultant in October 2000 (Tr. 331-32, 345), the evidence of no more than mild limitations assessed by other consulting sources (Tr. 106-109, 127-132, 147-153), as well as plaintiff's broad range of daily activities, provides substantial support for the ALJ's decision to give lesser weight to those more restrictive assessments.

With respect to the assessment of treating internist Dr. Kenneth Dozier, plaintiff contends that the numerous

27

references in Dr. Dozier's notes to plaintiff's subjective
reports of fatigue should not have been dismissed because, unlike
the notations in those notes to symptoms of mental impairments,
Dr. Dozier actually treated plaintiff for the hepatitis C and
cirrhosis that were ostensibly the source of the fatigue.
However, the undersigned finds that the ALJ's extensive
discussion of the medical evidence of plaintiff's liver disease
and Interferon therapy -- which the ALJ acknowledged as the cause
of significant symptoms for the five-month period between May and
September 2000 but which was otherwise tolerated with only
minimal side effects (Tr. 22-23) -- is more than sufficient to
justify his conclusion that active hepatitis was eradicated, and
that the evidence of fatigue prior to the conclusion of
Interferon therapy did not establish the requisite 12-month
duration of such symptoms at a disabling level of severity,
despite the contents of Dr. Dozier's treatment notes and medical
source statement.[4]  This result is also supported by the report
of consulting examiner Dr. Bruce Davis, who in September 2000
concluded that plaintiff could perform light work despite his
complaints of fatigue (Tr. 309-317).  Furthermore, plaintiff
reported substantial activities of daily living during his

_____

[4]It is noted that while Dr. Dozier opined in a medical source statement
that plaintiff's subjective symptoms were consistent with the conditions he
was treated for and would pose problems with regular attendance and
performance at work, he declined to complete that portion of the medical
source statement addressing plaintiff's work-related exertional limitations
(Tr. 406-410).

28

September 2000 consultative psychological examination (Tr. 320-21).

With respect to plaintiff's complaints of disabling fatigue and weakness following the remission of his hepatitis, the ALJ found his credibility significantly diminished by both the medical record and the plaintiff's report of daily activities.  While acknowledging that plaintiff had some problems with fatigue consistent with Dr. Dozier's notes, the ALJ noted that prescribed medications resolved plaintiff's difficulty with sleeping at night when plaintiff was compliant with this treatment; that his treating therapist consistently reported "secondary gain" as impairing his mental health prognosis; that he was non-compliant with several medication prescriptions, as well as with the treatment recommendation that he stop consuming alcohol excessively; that he exerted less than optimal effort on a pulmonary function study; that his work history suggested poor motivation to remain a member of the work force; and that his daily activities have remained robust despite his allegations, including reports that at all relevant times he remained capable of performing various housecleaning chores, caring for his children, cooking meals, making household repairs, washing his car, driving, etc.  He was also able to refinish a sewing table and move patio furniture.  The ALJ's credibility determination is due significant deference on judicial review, e.g., Hardaway v.

29

<u>Sec'y of Health & Human Svcs.</u>, 823 F.2d 922, 928 (6th Cir. 1987), and cannot justifiably be disturbed in light of the substantial evidence cited above.

Plaintiff next argues that the ALJ erred in failing to perform the function-by-function assessment of plaintiff's exertional abilities required by SSR 96-8p, citing authority for the proposition that where a ruling requires a specific finding, an implicit finding will not suffice. However, it does not appear that SSR 96-8p requires any such finding, but only requires separate *consideration* of the strength demands. Indeed, the Sixth Circuit has recognized the distinction between what an ALJ is bound to consider pursuant to SSR 96-8p, versus what he is bound to discuss in his written decision, holding that "[t]he ALJ need not decide or discuss uncontested issues, 'the ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record.'" <u>Delgado v. Comm'r of Soc. Sec.</u>, 30 Fed.Appx. 542, 547-48 (6th Cir. March 4, 2002)(unpublished)(quoting <u>Bencivengo v. Comm'r of Soc. Sec.</u>, 251 F.3d 153 (table), No. 00-1995 (3d Cir. Dec. 19, 2000)).

The ALJ in this case complied with the requirements identified in <u>Delgado</u> and <u>Bencivengo</u> vis-à-vis SSR 96-8p. He resolved the inconsistencies in the medical record by discounting

30

the late 2000-early 2001 opinions of one consulting physician and
two non-examining state agency physicians that plaintiff was
restricted to light work, citing their inability to review
evidence post-remission of plaintiff's hepatitis and contrary
evidence of his substantial daily activities (Tr. 33). The ALJ
also addressed plaintiff's alleged hand tremors, stating that
"[t]here is no evidence that rare hand tremors cause more than
minimal impact upon his ability to perform basic work related
activities. Physical examinations have revealed normal grip
strength and normal hand and finger movements." (Tr. 31). In
particular, plaintiff's 2003 consultative examination by Dr.
Albert Gomez revealed normal results across all body systems,
including plaintiff's hands and fingers, resulting in a finding
of no impairment-related physical limitations (Tr. 154-58).
However, the ALJ ultimately adopted the 2002 assessment of a non-
examining state agency physician that plaintiff was exertionally
limited to medium work, in deference to the level of fatigue
plaintiff credibly suffered from due to his chronic liver
disease. In light of these findings, and the absence on the
record before the ALJ of any significant dispute over the other
functions addressed in SSR 96-8p, the undersigned does not find
any error under that ruling.

Finally, plaintiff argues that the ALJ's finding that
he could perform his past relevant work at the medium level is

31

ill-founded, given the fact that in questioning the VE, the ALJ asked the expert to assume a residual functional capacity to perform "moderate" work with environmental limitations (Tr. 513-14). Plaintiff contends that under the regulations, "work is either sedentary, light, medium, heavy, or very heavy" (Docket Entry No. 10, pp. 19-20), and that "moderate" cannot be presumed the equivalent of medium for these purposes. However, as pointed out in the government's brief, the classification of certain past relevant jobs as medium work was established in a separate line of questioning to the VE, and the impact of the environmental restrictions was also established in the VE's testimony (Tr. 512-14). Moreover, it does in fact appear that the terms "moderate" and "medium" are often used interchangeably in social security cases, and the undersigned would not find prejudicial error on this basis alone. E.g., Reid v. Chater, 71 F.3d 372, 374 (10th Cir. 1995); Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994).

In sum, the undersigned concludes that the decision of the ALJ is supported by substantial evidence, and should therefore be affirmed.

32

## IV. RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be **DENIED**, and that the decision of the Commissioner be **AFFIRMED**.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 26th day of August, 2005.


 /s/ Joe B. Brown
JOE B. BROWN
United States Magistrate Judge

33